ARTHUR L. COX, Successor Guardian of Aquilla Redditt, Defendant-Appellant,

*v.*

STATE OF TENNESSEE, etc., et al., Complainant-Appellees.

439 S.W.2d 267.

(*Jackson,* April Term, 1968.)

Opinion filed March 26, 1969.

Thomas F. Turley, Jr., Memphis, for appellant.

GEORGE F. McCANLESS, Attorney General, and C. HAYES COONEY, Assistant Attorney General, Nashville, for appellee.

MR. JUSTICE HUMPHREYS delivered the opinion of the Court.

This case was instituted by the State of Tennessee through its Attorney General and the Superintendents of two of its mental hospitals, namely, Central State Hospital at Nashville, Tennessee, and Western State Hospital at Bolivar, Tennessee, to recover from the estate of Aquilla Redditt the cost of care, treatment and support rendered to Aquilla Redditt from October 15, 1924, to April 1, 1967. The Chancellor awarded the plaintiffs a recovery in the sum of $14,180.00 for the period between September 23, 1949, and April 1, 1967, and interest of $6,073.77, against Arthur L. Cox, Successor Guardian of the estate of Aquilla Redditt, non compos mentis, and

denied recovery for the period between October 16, 1924, and September 23, 1949, on the basis of laches. Both parties have appealed from those portions of the decree adverse to their interests.

This cause was heard by the Chancellor upon the pleadings and six stipulations. Contained therein are the following facts. Aquilla Redditt was indicted in the Criminal Court of Shelby County, Tennessee, on October 14, 1924, for the murder of his mother. At the arraignment Aquilla Redditt, appeared in person and with his attorney, and entered a plea of present insanity to the indictment. A trial on the issue of his present insanity was held, and a duly constituted jury determined that Aquilla was presently insane. In accordance with then Public Acts 1919, Chapter 17, secs. 17, 18 and now T.C.A. secs. 33-706, 33-707, Aquilla was forwarded to Western State Hospital to be confined and upon his being restored to sanity returned to the committing court for trial. Aquilla was confined at Western State Hospital from October 16, 1924, to November 10, 1932, at which time he was properly transferred to Central State Hospital where he has remained and is now.

The parties stipulated that "the insanity of Aquilla on October 15, 1924, at all times since and at present, was and is congenital, complete and beyond any known treatment". This is corroborated by a letter dated Janutry 22, 1962, from Dr. J. N. Fidelholtz, Director of Maximum Security at Central State Hospital.

When Aquilla was originally admitted to Western State Hospital in 1924, he was classified as a poor person or a first class patient, as defined under T.C.A. secs. 33-611, 33-613, and as such entitled to his hospitalized con-

finement at the expense of the State of Tennessee. This classification was retained until the commencement of this suit on May 11, 1961, at which time the State of Tennessee determined that Aquilla had always been and is now a third-class or private-pay patient as defined under T.C.A. secs. 33-612 and 33-616. The State seeks, pursuant to T.C.A. secs. 33-706 and 33-631, recovery of the amount of money Aquilla would have expended had he been classified a third-class, private-pay patient when admitted on October 16, 1924, to April 1, 1967.

The State originally sought recovery of this sum from those assets of Aquilla's estate acquired from his mother, who died on October 9, 1924; from a brother, who died on September 23, 1949; and from his father, who died on September 29, 1950. In Stipulation No. 5, the parties agreed to limit possible recovery to those assets acquired from Aquilla's father and brother.

A primary defense asserted by the defendant is the failure of the State to pursue timely its rights of recovery for hospital expenses against the father and other relatives of Aquilla Redditt under T.C.A. sec. 33-629, formerly Acts 1919, Chapter 17, sec. 22; Shan.Supp. sec. 2642a43; Code 1932 sec. 4488, which inaction it is alleged constituted laches. It is contended this delay by the State prejudiced Aquilla Redditt's estate because during the period from Aquilla's initial commitment in 1924 until his father's death in 1950, the father, Greenberry Redditt, had an estate sufficient to pay for Aquilla's care and maintenance but by the time Greenberry died, he had foolishly squandered the bulk of the estate. That, since his father could have been made to pay the hospital expenses out of this money he otherwise foolishly spent, without any right of subrogation against Aquilla or his

estate, Aquilla's inheritance from his father would have been just as much and would be free from the present claim.

Defendant also contended (1) that the confinement of Aquilla was not and has not been for the purpose of treating and benefiting him, but was for the protection of the State and its people like the imprisonment of any criminal and that to hold otherwise would amount to an unconstitutional forfeiture of the wards estate; and (2) that the statutes relied upon by the State for recovery do not permit recovery for those years of commitment prior to Aquilla's acquisition of any estate or property when he was classified as a poor person.

The Chancellor held that the State was entitled to recover care and maintenance per an itemized schedule in the record for the period of September 23, 1949, to April 1, 1967, amounting to $14,180.00, with interest from the date of filing May 11, 1961, amounting to $6,073.77, and further the State was prohibited from recovery for that time prior to September 23, 1949, because of laches. To this degree the parties have taken exceptions and filed appeals.

Summarized, Arthur L. Cox, Successor Guardian of Aquilla Redditt, contends (1) the commitment of Aquilla to a state mental hospital pursuant to T.C.A. sec. 33-706 is violative of the United States Constitution, Article 1, sec. 9, clause 3, prohibiting "Bills of Attainder", which term includes "Bills of pain and penalties,". (2) The attempt by the Complainant to recover the cost of care and maintenance rendered to Aquilla in the state institutions violates the Tennessee Constitution, Article 1, sec. 12, prohibiting forfeitures of estate to the sovereign for the

conviction of a crime. (3) The confinement of Aquilla for 44 years upon an indictment for murder and a determination that he lacked the mental capacity to assist his attorneys in formulating a defense constitutes a violation of the Tennessee Constitution, Article 1, secs. 8, 17 and the United States Constitution, Amendment 5, applicable to the states by Amendment 14, which guarantee in substance that no individual shall be deprived of his life, liberty or property but by the judgment of his peers or due process of law; (4) that Aquilla's confinement is the product of "criminal processes" requiring confinement of an insane person indicted for the crime of murder until sanity is restored. That the confinement's basic purpose is to protect society from this person for which the State should in accordance with principles of fairness and law bear the expense of such confinement as it would were Aquilla serving a sentence in prison, and (5) should the Complainant's right to recover be affirmed, interest should not be awarded since it would contravene the rule governing situations where interest should be allowed as delineated in Gibson's Suits in Chancery, 8th Ed., sec. 605.

The State contends the defense of laches should not have been sustained as to the period prior to September 23, 1949, since the failure of Complainant to collect the cost of care and maintenance from the father in no way prejudices Aquilla or his estate.

Defendant's first assignment of error asserts that confinement in a state mental institution pursuant to T.C.A. secs. 33-706 constitutes a "Bill of Attainder" prohibited by the United States Constitution, Article 1, sec. 9, clause 3 applicable to the states by Article 1, sec. 10. T.C.A. secs. 33-706, 33-707 are as follows:

"Sec. 33-706. *Expense of Maintenance—Chargeable to county's quota—Conveying to and committing to hospital—Return to prison on restoration of sanity.*— If any person charged with or convicted of crime be adjudged by the court before which he is so charged or convicted to be insane, and if such court shall order him to be confined in one of the state hospitals, he shall be received and confined in it at state expense, if he be a poor person as defined in sec. 33-611, and charged to the quota of that county if there be a vacancy. If there be no vacancy in the quota of that county, he must be received anyway, but if such person so received has an estate of his own, the expense of his maintenance and care in the hospital shall be paid from said estate as other pay patients in class three (3). In all such cases such patient shall be immediately upon being adjudged by the court insane turned over to the custody of the sheriff of the county who shall immediately proceed, in the manner hereinbefore provided, to communicate with the superintendent of the hospital and he shall be kept in the county jail until arrangements are made with the hospital to receive him, and he shall be conveyed to the hospital as all other patients. When a convict becomes insane, he may be committed to the hospital of the district from which he was convicted, and charged to the county where convicted, if a county patient. The prison physician and warden shall determine and certify his insanity. When sanity is restored he shall be returned to the prison and complete his term, being allowed credit for the period of his insanity.

Sec. 33-707. *Notice given clerk of committing court of restoration to sanity—Delivery of patient to county*

*sheriff*.—When any person confined in a state hospital, charged with crime and subject to be tried therefor, or convicted of crime and subject to punishment therefor, shall be restored to sanity, the superintendent shall give notice thereof to the clerk of the court by whose order he was confined, and deliver such patient to the sheriff of the county from which said patient was committed.''

■ A "Bill of Attainder" is a legislative act which inflicts punishment without a judicial trial, "where the legislative body exercises the office of judge, and assumes judicial magistracy, and pronounces on the guilt of a party without any of the forms or safeguards of a trial and fixes the punishment." *In re DeGiacomo*, C.C.N.Y. 1874, 12 Blat chf. 391, 7 Fed. Cas.Con. No. 3,747; see also, *Cummings v. Missouri*, 71 U.S. 277, 18 L.Ed. 356.

■ T.C.A. secs. 33-706, 33-707 are not a "Bill of Attainder." The first sentence in T.C.A. sec. 33-706 expressly states "If any person charged with or convicted of crime *be adjudged* * * * to be insane, etc." (emphasis added). The statute requires that a man must first be judicially determined insane before he may be committed to a state mental institution. The legislature did not usurp a judicial function but to the contrary required one. Aquilla in person and through his attorney, entered a plea of present insanity at his arraignment. There was a jury trial on this issue and he was adjudged insane.

The statute provides no punishment, pain or penalty. When T.C.A. sec. 33-706 is read in *pari materia* with sec. 33-707, as it must, the intention is simply that an insane person charged with crime be committed to a mental

hospital to be looked after like any other mentally ill person, until he can stand trial.

In the case of *State ex rel. Bricker v. Griffith*, 36 N.E. 2d 489 (1941) the Ohio Court of Appeals upheld a similar recovery by the State of Ohio upon statutes similar in wording and effect to the statutes herein. That Court stated with reference to a factual situation like the case *sub judice*, and to the same contentions as those raised by the Defendant herein, stated that:

"There would seem to be no doubt that Griffith was *committed* to the Lima State Hospital; that is a *hospital for the insane;* and that it is a *state* hospital. It is characterized in the law as a state hospital and the sole and only purpose of its creation was to provide hospitalization for the insane."

(36 N.E.2d 491)

"In our judgment he clearly was in Lima State Hospital by virtue of the determination of a duly constituted body, namely, the jury in Common Pleas Court, that he was an insane person. Having been so adjudged by virtue of Section 1985, G. C., subparagraph 4, he was committed, as an insane person, to the Lima State Hospital. It is true that another consequence attends because his insanity intervened to prevent duly constituted authority from requiring him to answer to the criminal charge against him and to assure that this be accomplished the law provides that if and when he is restored to sanity, he shall be returned to the custody of the court where he was indicted. Section 13613 G. C., as effective when Griffith was committed.

"The fact that Griffith stands indicted for crime operates not at all to effect his commitment nor his in-

cumbency in the hospital. It is only when and if he is restored to sanity that the indictment operates to cause his return to be tried thereon."

(36 N.E.2d at 491, 492)

"The effect of the verdict of a jury in the situation presented in this case is identical with the effect of an inquest conducted by the Probate Court, wherein the insanity of a person is determined. In the Probate Court an inquest of insanity is initiated by an affidavit of some person mentioned in Section 1890-23, G.C. The Probate Judge causes the person to be brought before him after due notice of the hearing. Upon hearing the Probate Judge may take testimony of witnesses and not to exceed two medical witnesses. He then makes determination whether or not the person on whom the inquest is being held is mentally ill or insane and, if so, orders him committed. The effect of the determination of the Probate Judge that the person is insane is identical with such determination by the jury in Griffith's case. Upon the verdict of insanity the Common Pleas Court may commit a person charged to be insane to the Lima State Hospital only. The Probate Court may commit him to such hospital or may commit him to some other state hospital. After the insane person has been committed to a hospital for the insane by the Probate Judge, the custody of that person is in the Superintendent of the hospital to which he was committed and his release from that institution depends entirely upon a determination of the Superintendent, with the written consent of the Director of Public Welfare, with which the Probate Judge has nothing to do. Now the subject of statute, G.C., 1890-49. *State ex*

*rel. Connor v. Lamneck,* 133 Ohio St. 257, 13 N.E. 2d 127.

"The same situation attends respecting the commitment and release of Griffith. The only difference is that in Griffith's case, if he is restored to sanity, the law requires that instead of permitting him to go free entirely, he is released from Lima State Hospital but is at that time placed into the custody of the Court of Common Pleas, wherein an indictment is and has been pending against him. If not restored to sanity his commitment operates in all particulars as if he had been committed by a Probate Judge."

(36 N.E.2d 493)

*Robinson v. California* (1962), 370 U.S. 660, 8 L.Ed.2d 758, 82 S.Ct. 1417, cited by defendant for the proposition that it cannot be made a punishable crime for a person to be insane is not in point. It holds that a statute making drug addiction an imprisonable crime is violative of the Federal Constitution, T.C.A. sec. 33-706 does not make insanity a crime.

■ Defendant's next insistence is that to require Aquilla to pay for his care and maintenance in the mental hospitals amounts to a violation of the Tennessee Constitution, Art. 1, sec. 12 prohibiting forfeiture of estate for conviction of a crime. Aquilla has not been tried or convicted of any crime nor is he being subjected to a forfeiture of estate. At common law, certain doctrines existed requiring the forfeiture of one's estate to the sovereign when guilty of specified crimes. The forfeiture therein effected was complete without regard to any consideration being rendered to the dispossessed culprit. The State is endeavoring not to effect a forfeiture of Aquilla's

estate but rather recompense for the *quid pro quo* rendered in the form of hospitalized care and maintenance. The State's action is analogous to a quantum meruit action in that it is to recover for the service and material items afforded Aquilla during his hospitalized confinement, not a forfeiture action.

Defendant's third contention is that Aquilla's confinement for 44 years on no more than an indictment for murder and a judicial determination that he lacked the capacity to assist his attorneys in formulating a defense constitutes a violation of the United States and Tennessee Constitutions' guarantees that no individual shall be deprived of his life, liberty or property but by judgment of his peers or by due process of law.

■ The argument that the abstract test of commitment on a plea of present insanity, mental ability to assist counsel, is not conclusive of the necessity of continued confinement, and so deprives defendant of his liberty without due process is untenable. It is stipulated the judgment on which defendant is confined is for present insanity. It is stipulated defendant has been insane ever since committed so we are not confronted with a case to which this argument might apply.

Defendant's fourth assignment is he should not pay because his confinement is essentially criminal so he should be treated as convicts are under T.C.A. sec. 41-301. That under T.C.A. sec. 33-706 a person, charged or convicted of crime and adjudged by the court before which he is so charged or convicted to be insane causing his commitment to a mental hospital by that court, is required to pay for the cost of his hospitalized care and maintenance unless he is a poor person as defined by

T.C.A. sec. 33-611. While, under T.C.A. sec. 41-301 et seq., a person who becomes insane while in prison receives his hospital care and maintenance at state expense regardless of financial status. Defendant further contends the essentially criminal character of his confinement is demonstrated by *Marsh v. Henderson,* 221 Tenn. 42, 424 S.W.2d 193, wherein it was held that one confined at Central State under a plea of present insanity for eleven (11) years was entitled to credit for those years, pursuant to the general intendment of T.C.A. sec. 40-3102, when he was restored to sanity, tried and convicted of a lesser degree of the crime charged.

■ Though superficially appealing this proposition does not justify a reversal. First, it has been generally recognized that the support and maintenance of insane criminals is primarily a matter of statutory regulation:

> *"Estate of insane person.* Where the statute so provides, the estate of persons charged with crime and found insane may be charged for their support and maintenance, and their estate, if any, may be liable to the county, town, city or district which has paid for their maintenance." 44 C.J.S. Insane Persons sec. 132, p. 290.

Second, in *Marsh,* supra, the Court did not say that time spent in a mental hospital under a plea of present insanity is tantamount to time spent in prison, the decision simply construed the general intendment of T.C.A. sec. 40-3102, which prescribes time periods applicable to the sentence of a convicted criminal.

■ Finally, the fact must be kept in mind that Aquilla is not a criminal, but a patient committed to the mental hospital pursuant to his own request, and that his con-

finement is not for a crime. As matters stand Aquilla has not even entered a plea to the indictment against him and, moreover, is presumptively innocent thereof.

Defendant cites *Dept. of Mental Hygiene v. Hawley* (1963), 59 Cal.2d 247, 28 Cal. Rptr. 718, 379 P.2d 22, but this case is not in point. That case held 28 Cal.Rptr. at p. 724, 379 P.2d at p. 28 the State could not recover the expenses of care and maintenance from the *relatives* of the insane person because ''only one who has been *charged with* or convicted of a crime may be made to suffer deprivation of his liberty, or be subjected to other penal sanction, for that crime'' (emphasis added). From this quote, it is patent in spite of several statements pointing in the opposite direction that the decision did not prohibit recovery from the insane defendant's estate, but from the insane defendant's relatives.

▮ We agree with appellant interest should not have been allowed on this claim. While the allowance of interest would ordinarily be permissible in the discretion of the chancellor, on a liquidated demand such as this we do not think it should have been allowed. First, because there is no provision for interest in T.C.A. secs. 33-616, 33-631, under which the state claim is made. Although liability is provided for and an elaborate arrangement for security and collection spelled out in detail, interest is not mentioned. In fact, sec. 33-631 expressly states the recovery shall consist of ''the whole amount of money expended for maintenance and care * * *''.

Additionally, when consideration is given to the fact that the state in this particular area is at most entitled to the return of its expenses and not to a profit by way of interest for the use of its money, and the further fact

that the State has unlimited time within which to recover, the statute of limitation having no application, the idea of interest is so downright unjust that we are moved to disallow it.

■ However, we do agree with the State that there is no real basis to deny a part of this claim for laches. The contention that the failure of the State to collect from Aquilla's father constitutes laches since the father practically dissipated his estate prior to his death, and that if the State had recovered from the father for those years out of money he squandered, Aquilla's inheritance from his father would not have been affected, is too tenuous to sustain the plea. The prejudice from this delay is too uncertain to set the doctrine in motion.

Here, we have a suit to collect a debt which is certain in amount, about which there are no doubts or defenses, by a party unaffected by the statute of limitation so it should not apply. In discussing laches Gibson categorizes the cases to which the doctrine applies [1] and this case does not come within any of these categories.

Moreover, we have a case, *State v. City of Columbia,* (Tenn.Ch.App.), 52 S.W. 511, holding that the doctrine of laches does not operate to bar a claim by the State for its revenue. While the general principle of the application of the doctrine of laches to the state may be subject to

---

[1] "Laches will bar suits (1) to open accounts and settlements long acquiesced in; (2) to change a boundary line long recognized; (3) to correct an alleged fraud, accident or mistake long submitted to; (4) to have a nuisance abated that has long existed; (5) to have a contract either rescinded or specifically enforced, when by delay the parties cannot be placed in statu quo; (6) or to have any transaction uprooted, or any business unravelled, when, in consequence of long acquiescence, the chances are that material evidence has been lost, that the memory of the facts has become dimmed, that parties or witnesses have died or removed, and that new rights have sprung up that should not be unsettled.

(Gibson, Vol. 1, p. 103, sec. 81)

further consideration in a case strongly calling for it, that is not the situation here. The State's assignment of error on this proposition is sustained.

With the decree of the lower court modified by the disallowance of interest, and by the allowance of a recovery on the full claim, unaffected by the doctrine of laches, the judgment as modified is affirmed.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN and CRESON, JUSTICES, concur.