## ANTHONY T. KOYCE *v.* STATE OF MARYLAND, CENTRAL COLLECTION UNIT

[No. 23, September Term, 1980.]

*Decided November 21, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Frances C. Gambo,* with whom was *M. Samuel Vetri* on the brief, for appellant.

*Dennis M. Sweeney, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Ronald J. Rinehart, Assistant Attorney General,* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

This case presents a narrow question of statutory construction, *i.e.,* whether a person involuntarily committed to a maximum security State hospital for the criminally insane after being found not guilty by reason of insanity of a criminal charge is liable for the cost of his care and treatment under the Mental Hygiene Law, Maryland Code (1957, 1972 Repl. Vol., 1976 Cum. Supp.), Art. 59, §§ 1-57.[1] The purpose and policy of the Mental Hygiene Law is stated in § 2:

> "It is the policy of the State of Maryland that the mental hygiene of its citizens be fostered and preserved to the best of the ability of the State. To that end, care and treatment to or for all citizens of the State affected by or afflicted with mental illness shall be provided without partiality. It is also the policy of this State that those persons who have financial resources sufficient to pay the cost of their care and treatment shall do so. The provisions of this article shall be construed in a manner consistent with the policy of the State as herein defined."

Under § 27, a person found not guilty of a crime by reason of insanity may be committed for evaluation to the Depart-

---

1. All references in this opinion to Art. 59 are to the 1972 Repl. Vol. and the 1976 Cum. Supp. Although Art 59 has been revised since 1976, none of the statutory provisions has undergone significant substantive changes relevant to this decision. The current version of Maryland's Mental Hygiene Law is found in Code (1957, 1979 Repl. Vol., 1980 Cum. Supp.), Art. 59, §§ 1-75.

ment of Health and Mental Hygiene (the Department). The court ordering the evaluation, after receiving the Department's report, is authorized by § 27 to direct that the person be confined in a facility designated by the Department "for treatment." [2] Section 39 concerns payment for treatment by patients who have been admitted to a State hospital under Art. 59:

"(a) It is the intent of this subtitle to require all patients financially able to do so to pay for mental health services received by them. Such obligations extend to not only the patients, but also to those legally responsible for them. Where such patients or their responsible relatives are unable to pay for their care, it is the intent of this subtitle that the cost of mental health services be financed in the manner provided by the legislature.

(b) The setting of charges for mental health services rendered in outpatient, inpatient and other facilities, the investigation of the financial ability to pay of patients, responsible relatives, and other persons legally chargeable for any obligation of the

---

**2.** Prior to its amendment by ch. 701 of the Acts of 1979, § 27 provided:

"A person who has been found not guilty of any crime by reason of insanity at the time of the commission of the act, in the discretion of the court may be committed to the Department of Mental Hygiene for confinement in one of the facilities of the State for examination and evaluation to determine, by the standards applicable to civil admission proceedings under §§ 11 and 12 of this article, whether such person by reason of mental disorder would, if he becomes a free agent, be a danger to himself or to the safety of the person or property of others. Upon the basis of the report by the facility, and any other evidence before it, the court may in its discretion, direct that the person be confined in a facility designated by the Department for treatment. He shall at any time after three (3) months from the date of his confinement for examination and evaluation have the right to apply for his release pursuant to the provisions of § 15 of this article. Before a hearing on such application and petition shall be held the applicant shall present a copy of the application and petition to the State's attorney of Baltimore City or the county from which the defendant was committed. Upon a negative report by the facility, the court having jurisdiction shall order the person promptly released unless good cause for a contrary determination as to dangerousness is shown by the State's attorney."

The current version of § 27 is contained in Art. 59, §§ 27-27C.

patient, the determination of the amounts of payments, the liability of patients and other legally chargeable persons, and the receipt, deposit and enforcement of payments shall be the same as set forth in § 601 of Article 43 of the Code." [3]

The facts in this case are not disputed. Anthony T. Koyce was charged with murder on January 14, 1974 and was sent to Clifton T. Perkins State Hospital (Perkins), a maximum security State hospital, for evaluation after he pleaded not guilty by reason of insanity. On January 28, 1975, Koyce was found not guilty by reason of insanity and was involuntarily committed to Perkins until such time as he was not a danger to himself or society. On April 28, 1978, Koyce was released from Perkins under its Conditional Release Program. See Art. 59, § 28. The State, through its Cental Collection Unit, sued Koyce for $4,155.34 for patient care provided to him from January 29, 1975 through February 25, 1978.

The case was submitted to the District Court upon a stipulation of facts, and it concluded that Koyce was not legally responsible for the bill. On appeal, the Baltimore City Court (Levin, J.) found it undisputed that (1) Koyce suffered from mental illness during his stay at Perkins; (2) he was financially able to pay for the cost of his care; (3) mental health services were rendered to Koyce; and (4) Perkins is a mental health facility of the Department. In rejecting Koyce's argument that the governing statutes did not require that he pay for his treatment at Perkins, the court recognized that he was "in a sense involuntarily committed and was at Perkins so that society could be protected . . . ." Nevertheless, the court observed that Koyce, having been acquitted of the criminal offense, "could be released at any time he satisfied the statutory requirements as opposed to an incarcerated prisoner who must complete his prison term." Judge Levin concluded that Koyce's

---

3. The Financing of Mental Health Services subtitle of Art. 59, found in §§ 39 to 47, was amended by ch. 377 of the Acts of 1975, effective January 1, 1976. Sections 40 to 44 of Art. 59 were repealed by ch. 377 and essentially reenacted in Art. 43, § 601.

detention "was for mental illness not criminality," and that this differed "from incarceration in prison for crime even when such detention emanates from accusation of crime." The court said that the Legislature had clearly drawn this distinction in the statutes and because Koyce had received mental health services he must pay for them. We granted certiorari to consider the important issue raised in the case.

Before us, Koyce reasserts his position that the payment provisions of Art. 59 were intended to apply only to those persons civilly, as opposed to criminally, committed to a State mental institution. People who are committed as a result of criminal proceedings under § 27, he argues, are placed in an institution for the protection of society and not for the benefit of the patient. Koyce points to procedural differences for committing and releasing patients who arrive at State institutions under § 27 as distinguished from those civilly admitted under §§ 11 and 12. Finally, he argues that there is no clear indication that the Legislature intended that patients at Perkins pay for their care.

The State contends that the language of Art. 59 clearly provides for payment by all financially able patients committed to Perkins for treatment. Because the words of the statute are clear and reveal the Legislature's intent, the State argues that there is no need to look beyond these words. It suggests that if the statutory language is found to be ambiguous, any differences between the purpose or procedure for commitment under § 27 as opposed to §§ 11 or 12 are not relevant in deciding whether the Legislature intended that persons committed under § 27 should pay for their care if able to do so.

Prior to major revisions and reorganization in 1970, Art. 59 was entitled "Lunatics and Insane." In 1919, this Court considered whether the estate of a person involuntarily committed to a State mental institution after being found not guilty of murder because of insanity was liable for the cost of his care under the then existing provisions of Art. 59. *Wagner v. M. & C. C. of Balto.*, 134 Md. 305, 106 A. 753 (1919). Section 1 of Art. 59 provided at that time for civil commitment to State mental hospitals, while § 5 contained

provisions for committing persons found not guilty of a crime because of insanity. Section 45 prescribed payment to the State of $100 per year by the political subdivision from which the "patient" had been referred and provided that such payments for the cost of care and treatment would be a charge against the patient's estate. Wagner had been a patient in a State institution for many years when Baltimore City, pursuant to § 45, sued his estate to recover a portion of the money the city had paid to the State for the cost of his care. Wagner contended that he was not liable for the cost of his care because § 45 was intended to apply only to those people who were civilly committed under § 1. The Court disagreed and held that Wagner's estate was liable for a statutorily defined portion of the cost of his care:

> "[I]n applying [§ 45] of the statute, we discover no sound reason for distinguishing between those who upon application are adjudged insane and those who are found to be insane under sections 4 and 5 of [Art. 59]; nor do we find anything in the statute indicating that it was the intention of the Legislature to create such distinction." *Id.* at 309.

Following the *Wagner* decision, the Legislature amended Art. 59 by enacting ch. 735 of the Acts of 1920. The amended version contained separate sections that governed payment for care by those patients who had been civilly committed and those who had been criminally committed. Both types of patients, if financially able to do so, were required to pay for the treatment they received in a State mental hospital. In 1970, the Legislature substantially revised Art. 59 and renamed it the "Mental Hygiene Law."

Part of the basic policy of Art. 59 is to "require all patients financially able to do so to pay for mental health services received by them." *Id.* at § 39 (a). Exceptions to this general rule are specifically noted in Art. 59. First, if a patient is financially unable to pay, then the cost of care and treatment is borne by the State. Second, under § 46, court-ordered examinations of potential patients by the Department are to be paid for by the State unless the examination is requested

by the person to be examined.[4] The procedures for setting rates and collecting fees are set forth in § 601 of Art. 43. Section 601 (a) provides that the Secretary of the Department "shall by rule and regulation set charges for services rendered by the Department in . . . regional and State hospitals . . . for the physically and mentally ill . . . ." Section 601 (b) (1) states that the Department "shall investigate the financial condition of *all patients,* their responsible relatives, and other persons legally chargeable for any obligation of the patient in order to determine the ability of the patient or his responsible relatives to pay for the cost of care of the patient." (Emphasis supplied.) Payments are to be made by the patient or other responsible person to the Department. *Id.* at § 601 (c). The Central Collection Unit is responsible for collecting all delinquent accounts. *Id.* at 601 (b) (5).

In determining whether the Legislature intended to exempt persons committed to a State mental institution under § 27 from the payment provisions of Articles 59 and 43, we strive to ascertain and effectuate the real intention of the Legislature. *E.g., Cider Barrel Mobile Home v. Eader,* 287 Md. 571, 414 A.2d 1246 (1980); *Harbor Island Marina v. Calvert Co.,* 286 Md. 303, 407 A.2d 738 (1979); *Unnamed Physician v. Comm'n,* 285 Md. 1, 400 A.2d 396, *cert. denied,* 444 U.S. 868, 100 S. Ct. 142, 62 L. Ed. 2d 92 (1979). In so proceeding, we first look to the language of the statute itself. *E.g., Board v. Stephens,* 286 Md. 384, 408 A.2d 1017 (1979); *Comptroller v. John C. Louis Co.,* 285 Md. 527, 404 A.2d 1045 (1979); *Collier v. Connolley,* 285 Md. 123, 400 A.2d 1107 (1979). When the language is plain and unambiguous, there is no need to look beyond the language itself, which should be given effect in accordance with the plain meaning of the words. *E.g., John McShain, Inc. v. State,* 287 Md. 297, 411 A.2d 1048 (1980); *Mauzy v. Hornbeck,* 285 Md. 84, 400 A.2d 1091 (1979).

---

4. An additional exception pertains to persons confined in a penal institution who are transferred to a facility licensed by or under the jurisdiction of the Department. In these situations, "payment of appropriate expenses" is to be made by the Department. Art. 59, § 16.

In light of these principles of statutory construction, we conclude that the Legislature intended persons committed to a State mental hospital under Art. 59, § 27 to pay for the cost of their care and treatment if financially able to do so. As we have already indicated, § 2 sets forth the State's policy regarding the provision of mental health care to its citizens and states without equivocation that "those persons who have financial resources sufficient to pay the cost of their care and treatment shall do so." Section 2 also states that the provisions of Art. 59 are to be construed in a manner consistent with this policy. Section 39 provides that "all patients" who are financially able to do so shall pay for the "mental health services received by them." Article 43, § 601 (c) (1) states that "[p]ayments shall be made [to the Department] by the patient, a responsible relative or other person who may be legally chargeable with his or her care." The two specific exceptions to liability under Art. 59, court-ordered evaluations and inability to pay, are not applicable here.

It is undisputed that (1) Koyce was admitted to Perkins, a State hospital under the jurisdiction of the Department, *see* Art. 59, § 31 (a), and that he received mental health services while he was there; (2) that he suffered from mental illness during his stay at Perkins; (3) that the amount charged for the mental health services was properly calculated and all necessary administrative procedures were followed; and (4) that Koyce is financially able to pay for the services rendered. Thus, if Koyce was a "patient" within the meaning of Articles 43 and 59, he must pay for the care and treatment he received at Perkins.

The word "patient" is not defined in either Art. 59 or the relevant subtitle of Art. 43. Black's Law Dictionary 1014 (5th ed. 1979) defines "patient" as a "[p]erson under medical or psychiatric treatment and care." *See also Smith v. Gill,* 293 Ala. 736, 310 So. 2d 214 (1975); *State ex rel. Mental, Etc. v. Guardianship,* 393 N.E.2d 235 (Ind. App. 1979). As used in Art. 59 and Art. 43, § 601, the plain meaning of the word "patient" would appear to include, but not necessarily be limited to, any person suffering from a mental illness who is admitted to a State mental health facility under the jurisdic-

tion of the Department. Koyce, who was admitted to Perkins and received treatment for his mental illness for over three years, clearly qualified as a "patient" within the commonly understood meaning of that word. Therefore, consistent with the holding of our predecessors in *Wagner, supra,* we hold that Koyce is liable for the cost of his care and treatment at Perkins, as charged to him by the State. This conclusion is in accord with the majority of jurisdictions that have interpreted statutory provisions substantially similar to those before us today. *See generally State v. Estate of Burnell,* 165 Colo. 205, 439 P.2d 38 (1968); *State v. Kosiorek,* 5 Conn. Cir. 542, 259 A.2d 151 (1969); *In re Estate of Schneider,* 50 Ill. 2d 152, 277 N.E.2d 870 (1971); *Department of Mental Health v. Pauling,* 47 Ill. 2d 269, 265 N.E.2d 159 (1970); *State ex rel. Mental, Etc. v. Guardianship,* 393 N.E.2d 235 (Ind. App. 1979); *Briskman v. Central State Hospital,* 264 S.W.2d 270 (Ky. 1954); *In the Matter of Sargent,* 116 N.H. 77, 354 A.2d 404 (1976); *State v. LeVien,* 44 N.J. 323, 209 A.2d 97 (1965); *State ex rel. Dorothea Dix Hospital v. Davis,* 292 N.C. 147, 232 S.E.2d 698 (1977); *State v. Griffith,* 36 N.E.2d 489 (Ohio App. 1941); *Commonwealth v. Evans,* 253 Pa. 524, 98 A. 722 (1916); *Cox v. State,* 222 Tenn. 606, 439 S.W.2d 267, *appeal dismissed,* 396 U.S. 18, 90 S. Ct. 162, 24 L. Ed. 2d 18 (1969). *But see Ollerton v. Diamenti,* 521 P.2d 899 (Utah 1974); *In re Grams,* 63 Wis. 2d 194, 216 N.W.2d 889 (1974).

> *Judgment affirmed; costs to be paid by the appellant.*