[Sac. Nos. 995, 996.    Department One.—January 24, 1903.]

## NAPA STATE HOSPITAL, by C. B. SEELEY, Treasurer, Appellant, v. COUNTY OF YUBA, Respondent.

NAPA STATE HOSPITAL—CAPACITY OF TREASURER TO SUE.—The treasurer, in the name of the Napa State Hospital, has legal capacity to sue upon any cause of action accruing to the hospital, under the act of 1897.

ID.—SUPPORT OF INSANE CRIMINALS—CAUSE OF ACTION OF STATE ASYLUM "ACCRUING" TO STATE HOSPITAL.—The Napa State Hospital is vested, by the terms of the act of 1897 creating it, with all property then belonging to the Napa State Asylum for the Insane; and a cause of action then existing in favor of the state asylum, for the support of insane criminals committed by the superior court of a county to the asylum, must be deemed to be "accruing" to the state hospital, when it ceased to be the property of the asylum, and became the property of the hospital.

ID.—CASE CRITICISED AND LIMITED.—The case of *Napa State Hospital* v. *Flaherty,* 134 Cal. 315, is criticised and limited, and held not to be controlling authority in the present case.

ID.—CODE PROVISION—LIABILITY OF COUNTY TO SUPPORT INSANE CRIMINALS—CONSTITUTIONAL LAW.—The provision of section 1373 of the Political Code, making the county chargeable with the support of insane criminals committed there after the verdict of a jury establishing their insanity, is not a special law prohibited by section 25 of article IV of the state constitution, and does not violate section 2 of article I, requiring laws of a general nature to have a uniform operation; but is constitutional and valid.

ID.—PROVISION NOT REPEALED.—The provision of section 1373 of the Political Code is not repealed by the Insanity Act of 1897 nor by any of the various County Government Acts.

APPEALS from judgments of the Superior Court of Yuba County. E. A. Davis, Judge.

The facts are stated in the opinion.

Tirey L. Ford, Attorney-General, and George L. Hughes, for Appellant.

E. P. McDaniel, for Respondent.

GRAY, C.—These two actions were brought to recover the expense of keeping Hugh Buchanan, an insane person, at the hospital, plaintiff. The actions covered two different periods of time, and in each of them the defendant interposed a demurrer to the complaint, which was sustained, without leave to amend, and the plaintiff brings a separate appeal in each case from the judgment which followed. As these appeals involve the same questions, we will dispose of them in one opinion.

Buchanan was charged with murder, and put upon trial therefor in the superior court of Yuba County. A doubt arose as to his sanity, his trial was suspended, and the question of his sanity submitted to a jury called specially to determine that question under the provisions of section 1368 et seq. of the Penal Code. The jury found the defendant insane, and the court ordered his trial suspended until he should become sane, and that he be in the mean time committed by the sheriff to the plaintiff, hospital for the insane, in accordance with the pro-

visions of section 1370 of the Penal Code. These suits were thereafter brought under the provisions of section 1373 of the Penal Code, to recover the expense of the keeping of said Buchanan in said hospital under said order of the court.

1. The first point presented on this appeal is, in the language of the demurrer, "that plaintiff has not legal capacity to sue." The respondent urges this want of capacity in appellant as a reason why the demurrers were properly sustained. Waiving the questions made by appellant as to the sufficiency of the demurrer to raise the question of want of legal capacity, we are of opinion that the complaint shows on its face that the plaintiff named therein has legal capacity to sue for the whole amount sought to be recovered in each case. Part of the aggregate amount sought to be recovered, it is true, accrued before the Insanity Law of 1897 went into effect, and as the name of "Napa State Asylum" was in effect changed by that act to that of the "Napa State Hospital," it may be said, as is claimed by respondent, that a portion of the claims originally accrued to the Napa State Asylum. However, in the act of 1897 (see Stats. 1897, p. 315) it is provided that "all properties now belonging to said Napa State Asylum for the Insane, and all moneys to its credit with the state controller and state treasurer, are hereby transferred to the Napa State Hospital"; and it seems clear from this provision that whatever claim existed in favor of the "asylum" before the act, being a species of property, it passed to, and under the law became the property of, the "hospital" when the act went into effect. And this must be true, whether we treat the old institution as still in existence under the new name or the old as having been abolished or displaced by the new institution under the act. The suits having been begun after the act went into effect, certainly the party named in the act, "the treasurer in the name of the hospital," had "legal capacity to sue upon any cause of action accruing to the hospital." (See Stats. 1897, p. 324, sec. 13.) One meaning of the word "accrue" is "to vest," and in this sense the claim accrued to the hospital when it ceased to be the property of the asylum and became the property of the hospital. (Rapalje's Law Dictionary, title "Accrue.")

The case of *Napa State Hospital* v. *Flaherty,* 134 Cal. 315, is in seeming conflict with this position, but we think the

opinion in that case too narrowly limits the meaning of the word ''accruing'' as used in section 13 of article II of the act of 1897 (Stats. 1897, p. 324). At all events, the case should not control our decision here, for there the court was dealing with a claim that had accrued to the asylum under the general Insanity Act of 1899, which had been repealed, in large part at least, by the act of 1897, but, as we shall presently see, the section of the Penal Code (1373) upon which the rights of plaintiff are based in this action was not repealed by the general Insanity Law of 1897; and we are not called upon here to consider the effect of the act of 1897 upon claims arising under the act of 1889.

2. It is next contended in support of the demurrer and judgment that section 1373 of the Penal Code is unconstitutional, as being in conflict with the provisions of that instrument inhibiting special laws (Const. 1879, art. IV, sec. 25), and because it violates section 2 of article I of the same constitution, which requires that all laws of a general nature shall have a uniform operation. There is no merit in this contention. Chapter VI, of which section 1373 of the Penal Code is the concluding section, provides for the commitment to the insane asylum of a person charged with crime, who is found by a jury to be insane, until he shall recover, and on such recovery to be returned to the court for trial. The said section 1373 reads as follows: ''The expenses of sending the defendant to the asylum, of keeping him there, and of bringing him back, are in the first instance chargeable to the county in which the indictment was found or information filed, but the county may recover them from the estate of the defendant, if he have any, or from a relative, town, city, or county bound to provide for and maintain him elsewhere.'' The ''class'' of persons embraced in the chapter and section is one which in the nature of things requires laws applicable alone to such class. Persons charged with crime who are or become insane naturally belong to a class distinct and different from insane persons who are not so charged with crime. Under the general law, the expense of capture, detention, and prosecution of persons charged with crime is to be borne by the county. The party, though insane, is still detained under the law to answer for his crime when he shall become sane. If he were not charged with crime, though he were insane, he

might not be sent to the asylum. His insanity might be of a nature not requiring that he be restrained, or his friends, relatives, or guardian might take care of him or consign him to a private institution. If, however, he is charged with crime, he must be committed to the asylum, if found insane, whatever the nature of his insanity may be. He is thus committed that he may be held in the custody of the law to await his trial or sentence, and his commitment is a part and parcel of the administration of the criminal law. If he were not insane the defendant would, on a continuance of his case, be sent to jail or released on bail; being insane, the court, under the Penal Code provision, commits him to the asylum pending the continuance. It is perfectly natural and proper, then, that the expense of his detention in the one place should be borne by the county as it is in the other. And there is no good reason why the expense should be borne by the state in the first instance as in the case of other insane persons. The party is held in custody, not because he is insane, but primarily because he is charged with crime. The section then invades no constitutional inhibition against special laws, because it places the expense of the keeping in the asylum or hospital just where it should rest under the general law, and implies no classification, except such as must exist and be recognized in the very nature of things.

Nor is there anything to indicate an arbitrary or unequal operation of the law; it applies to all persons charged with crime who become insane and to all counties alike.

We do not deem it necessary to specifically answer every objection to the section urged by respondent along this line, but content ourselves with saying that in our opinion it is not in conflict with any provision of our constitution.

3. Nor can we uphold the contention of respondent that said section 1373 of the Penal Code was repealed by the Insanity Act of 1897 and by the various County Government Acts. The general Insanity Law of 1897, and the various County Government Acts, where they relate to the expense of transporting and caring for the insane, relate to cases where the person is detained because he is insane to a degree, and under such circumstances that it is necessary that he should be restrained by the state, and provide that the state should bear the expense, in the first instance at least. They

do not even purport to apply to cases where the primary object is to hold the party in custody pending his trial or sentence. The chapter of which section 1373 of the Penal Code is a part is expressly recognized as still in force by the act of 1897, which provides: "A patient committed to a hospital under the provisions of chapter six, title ten, part two, of the Penal Code of this state, shall, upon the certificate of the superintendent that such person has recovered, approved by the superior judge of the county from which the patient was committed, be redelivered to the sheriff of such county, and, dealt with as provided for by said chapter six of the Penal Code." This shows that the legislature well understood that the asylum for the insane was a place of detention of patients charged with crime, as an accessory to the criminal court, and the patient was to be returned to such court when restored to reason. It did not in this act specially recognize and continue in force the said section of the chapter 1373, nor was it necessary that it should be so specially recognized. It was sufficient to recognize the principle upon which it was based and the very reason that called it into being. It was adopted and made part of the Penal Code when that code was first enacted into law, because it was recognized that the expense there provided for was a necessary part of the expense of maintaining the criminal law and administering justice through the criminal courts; and a subsequent recognition by the legislature of the validity of the proceeding in a criminal case when the defendant becomes insane is also an implied recognition of the validity of the law providing for the expense of such a proceeding. The section of the Penal Code in question is not in conflict with any subsequent enactment, but can be easily harmonized with every act that has been passed since the adoption of the code, and it is our duty to so harmonize it when we can reasonably do so. "Every effort must be used to make all acts stand, and if by any reasonable construction they can be reconciled the later act will not operate as a repeal of the former act. It is frequently found that the conflict between two statutes is apparent only as their objects are different, and when the language of each is restricted to its own objects they run in parallel lines without meeting." (23 Am. & Eng. Ency. of Law, 1st ed., pp. 492-493.)

We are aware that this court has said in several recent cases that the Insanity Law of 1897 was intended as a revision of the laws relating to the government and management of asylums for the insane, and that as such it was intended to repeal all former laws not in harmony with it. These cases are in no way inconsistent with our present view, for the statute here under consideration was intended to regulate prosecutions for crime rather than to control hospitals for the insane.

We think the demurrer to the complaint was improperly sustained, and advise that the judgment be reversed, with leave to defendant to answer.

Haynes, C., and Smith, C., concurred.

For the reasons given in the foregoing opinion the judgment is reversed, with leave to defendant to answer.

Shaw, J., Angellotti, J., Van Dyke, J.