[S. F. No. 21219. In Bank. Feb. 28, 1963.]

DEPARTMENT OF MENTAL HYGIENE, Plaintiff and Respondent, v. WILLIAM A. HAWLEY, Defendant and Appellant.

248

Emory L. Morris, Kenneth C. Gillis and Webster Street for Defendant and Appellant.

Stanley Mosk, Attorney General, Harold B. Haas, Assistant Attorney General, Lawrence E. Doxsee and Elizabeth Palmer, Deputy Attorneys General, for Plaintiff and Respondent.

SCHAUER, J.—Defendant appeals from a summary judgment for the sum of $8060.55 entered against him in an action by the Department of Mental Hygiene of the State of California to recover the alleged cost of care, support and maintenance of his son John Powell Hawley in a state institution for the insane for the period of January 1956 through October 1960. For reasons which will appear, we have concluded that such costs may not lawfully be charged against defendant, and that the judgment should be reversed.

Defendant's son, hereinafter called John, was born in August 1936. In November 1952 he was certified to be mentally ill and admitted to Camarillo State Hospital. In March 1955 he was granted a leave of absence from Camarillo and secured gainful employment. On December 9, 1955, after having been held to answer and committed without bail, he was charged by information with the murder (in October 1955) of his mother, Iris Hawley. On December 14, 1955, John was arraigned in the superior court and his counsel at that time stated that the accused wished to enter a plea of not guilty by reason of insanity, and further informed the court that "there is a serious question as to his present . . . sanity. . . ." The minutes show that the sole plea of not guilty by reason of insanity was entered. The court thereupon appointed three psychiatrists to examine John, and continued the matter to February 2, 1956.

On the appointed date the court received the reports of the psychiatrists, found John "legally insane at present" and pursuant to the provisions of sections 1368 et seq. of the Penal Code,[1] committed him to Atascadero State Hospital

---

[1]Sections 1368 et seq. provide for commitment of a defendant who is unable to understand the nature and purpose of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational

"for treatment, to remain there until certified by staff and Superintendent of hospital that defendant is no longer insane, as indicated, at which time defendant is to be returned to this court. Further proceedings suspended until such time." No finding was made with respect to the plea of not guilty by reason of insanity; it is unnecessary in this civil action to consider whether, due to the circumstances attending its entry, it would stand as a valid plea in the event that defendant should recover his sanity and move to vacate it.

■ Until and unless vacated it purports to admit commission of the act which, but for M'Naughton type insanity, would effect the crime charged. (Pen. Code, § 1016;[2] *People* v. *Brock* (1962) 57 Cal.2d 644, 648 [1] [21 Cal.Rptr. 560, 371 P.2d 296]; *People* v. *Walker* (1948) 33 Cal.2d 250, 264 [9] [201 P.2d 6].) In any event, the fact of the matricide by John is unquestioned.

In October 1959 John addressed a letter to the court requesting that he be permitted to stand trial, but the superintendent of the hospital reported that "although he understands the charges against him, he would be unable to assist rationally in his defense." John was still held at Atascadero when this action was filed in February 1961 seeking recovery from John's father for the costs of maintaining him there. Defendant answered the complaint, and each party thereafter moved for summary judgment. The motion of plaintiff was granted, that of defendant was denied, and judgment was entered accordingly. This appeal by defendant father followed.

■ In support of the judgment against the father plaintiff relies upon section 6650 of the Welfare and Institutions Code. As noted in the margin[3] that section was amended in

manner. (*People* v. *Brock* (1962) 57 Cal.2d 644, 648-649 [2] [21 Cal. Rptr. 560, 371 P.2d 296]; *People* v. *Merkouris* (1959) 52 Cal.2d 672, 678 [3] [344 P.2d 1].)

[2]Section 1016 of the Penal Code provides among other things that "A defendant who pleads not guilty by reason of insanity, without also pleading not guilty, thereby admits the commission of the offense charged."

[3]Section 6650, Welfare and Institutions Code, provides:
"The husband, wife, father, mother, or children of a mentally ill person or inebriate, the estates of such persons, and the guardian and administrator of the estate of such mentally ill person or inebriate, shall cause him to be properly and suitably cared for and maintained, and shall pay the costs and charges of his transportation to a state institution for the mentally ill or inebriates. The husband, wife, father, mother, or children of a mentally ill person or inebriate, and the administrators of their estates, and the estate of such mentally ill person or inebriate, shall

1945 by addition of the provisions which purport to impose upon the designated relatives liability for the care, support and maintenance of mentally ill persons committed *pursuant to either section 1026, or sections 1368 et seq. of the Penal Code.* Defendant father contends that the costs of support and maintenance of one detained under such circumstances may not validly be imposed upon members of the family of the accused. This position is sound.

In *Napa State Hospital* v. *Yuba County* (1903) 138 Cal. 378 [71 P. 450], the court after first noting (p. 381) that sections 1367 through 1373 of the Penal Code have to do with commitment "to the insane asylum of a person charged with crime, . . . until he shall recover, and on such recovery . . . be returned to the court for trial," went on to declare that (pp. 381-382) "Persons charged with crime who are or become insane naturally belong to a class distinct and different from insane persons who are not so charged with crime. Under the general law, the expense of capture, detention, and prosecution of persons charged with crime is to be borne by the county.[4] The party, though insane, is still detained under the law to answer for his crime when he shall become sane. If he were not charged with crime, though he were insane, he might not be sent to the asylum. His insanity might be of a nature not requiring that he be restrained, or his friends, relatives, or guardian might take care of him or consign him to a private institution. If, however, he is charged with crime, he must be committed to the asylum, if found insane, whatever the nature of his insanity may be. He is thus committed that he may be held in the custody of the law to await his trial or sentence, and his commitment is a part and parcel of the administration of the criminal law. If he were not insane the defendant would, on a continuance of his case, be sent to jail or released on bail; being insane, the court, under the Penal Code provision, commits him to the asylum pending the continuance. . . . The party is held in custody, not because he is insane,

---

be liable for his care, support, and maintenance in a state institution of which he is an inmate. The liability of such persons and estates shall be a joint and several liability, *and such liability shall exist whether the mentally ill person or inebriate has become an inmate of a state institution pursuant to the provisions of this code or pursuant to the provisions of Sections 1026, 1368, 1369, 1370, and 1372 of the Penal Code.*" (Italicized portion was added in 1945. Stats. 1945, ch. 247, § 1, p. 710.)

[4]We are not concerned in the cause now at bench with any question of responsibility as between the state and a county.

but primarily because he is charged with crime.'' In other words the person so held is detained for the protection of the public at large.

That one committed to a state hospital for the insane under provisions of the Penal Code is regarded by the state in a different light from one under civil commitment is further pointed up by section 6700.5, added to the Welfare and Institutions Code in 1961. This section provides that ''Whenever, in the opinion of the Director of Mental Hygiene and with the approval of the Director of Corrections, any person who has been committed to a state hospital pursuant to provisions of the Penal Code needs care and treatment under conditions of custodial security which can be better provided within the Department of Corrections, such person may be transferred for such purposes . . . to an institution under the jurisdiction of the Department of Corrections. . . .'' (See also Welf. & Inst. Code, § 6723; and Pen. Code, §§ 2684, 2685, 6400, 6402, 6450 and 6550.)[5] Plaintiff does not contend that any California statute attempts to cast on relatives any lia-

[5]Section 6723, Welfare and Institutions Code:
''Whenever a person, committed to an institution subject to the jurisdiction of the Department of Mental Hygiene under one of the commitment laws which provides for reimbursement for care and treatment to the State by the county of commitment of such person, is accused of committing a crime while confined in such institution and is committed by the court in which the crime is charged to another institution under the jurisdiction of the Department of Mental Hygiene or the Department of Corrections, the State rather than the county of commitment shall bear the subsequent cost of supporting and caring for such person.''

Section 2684, Penal Code:
''If, in the opinion of the Director of Corrections, the rehabilitation of any mentally ill, mentally deficient, or insane person confined in a state prison may be expedited by treatment at any one of the state hospitals under the jurisdiction of the Department of Mental Hygiene, the Director of Corrections, with the approval of the Adult Authority, shall certify that fact to the Director of Mental Hygiene who may authorize receipt of such prisoner at one of such hospitals for care and treatment. The superintendent of the hospital shall receive the prisoner and keep him until in the opinion of the superintendent such person has been treated to such an extent that he will not benefit from further care and treatment in a state hospital.''

Section 2685, Penal Code:
''Upon the receipt of a prisoner, as herein provided, the superintendent of the state hospital shall notify the Director of Corrections of that fact, giving his name, the date, the prison from which he was received, and from whose hands he was received. When in the opinion of the superintendent the mentally ill, mentally deficient or insane prisoner has in the opinion of the superintendent [sic] been treated to such an extent that such person will not benefit by further care and treatment in the state hospital, he shall immediatey notify the Director of Corrections of that fact. The Director of Corrections shall immediately send for, take

bility for supporting a defendant transferred to or held under the jurisdiction of the Department of Corrections.

In discussing the commitment of a defendant to a state hospital pursuant to Penal Code section 1026, the court in *In re Slayback* (1930) 209 Cal. 480, 490-491 [5] [288 P. 769], pointed out that "If it is the duty of the state to restrain one mentally afflicted, as held by the above authority [*Hammon* v. *Hill* (1915) 228 F. 999, 1001] and others that might be cited here, this duty becomes far more urgent and pressing when it is proven that such person is not only insane, but has developed criminal tendencies as a result of his mental derangement which has caused him to take the life of a human being under circumstances which, but for his mental state, would amount to murder. In endeavoring to perform this duty of caring for those who are mentally afflicted and of *protecting the public* from injury by those insane persons who have been proven to possess criminal tendencies . . ." (italics added), the Legislature enacted the pertinent sections of the Penal Code.

*In re Cathey* (1961) 55 Cal.2d 679 [12 Cal.Rptr. 762, 361 P.2d 426], was before us on application for habeas corpus wherein petitioner, who had been committed pursuant to sections 1368 et seq. of the Penal Code and confined in a hospital under the jurisdiction of the Department of Corrections, sought to compel his custodial transfer to the Department of Mental Hygiene. Our decision denying the writ points out (p. 691 [10]) that petitioner is "not a mere mentally ill patient, committed only for treatment as such. By contrast, he is a defendant being held for multiple trials (when he recovers sanity) on various felony counts including one nonbailable charge of murder in San Luis Obispo County and a similar charge in Los Angeles. . . . [Pp. 693-694 [16].] Petitioner is correct in his insistence that he is not serving a sentence as a convicted felon, but he is mistaken in his assumption that he is entitled to be treated exactly as he was [when] at Atascadero. He has no right to be confined under circumstances which will give him the oppor-

---

and receive the prisoner back into prison. The time passed at the state hospital shall count as part of the prisoner's sentence."

Sections 6400, 6402, 6450 and 6550 relate to a narcotic detention, treatment and rehabilitation facility newly created within the Department of Corrections and to relevant commitment procedures. Commitments pursuant to section 6450 are civil in nature. (See *In re De La O* (1963) *ante*, pp. 128, 156 [28 Cal.Rptr. 489, 378 P.2d 793]; see also *People* v. *Gross* (1955) 44 Cal.2d 859, 860 [1, 2] [285 P.2d 630].)

tunity to kill or maim his custodians, his fellow inmates or himself, or to destroy the property of the institution where he is detained. He does have a right to care and treatment, within the limits permitted by the nature of the security risk which he presents, looking toward his restoration to sanity so that he can be tried on the pending criminal charges." (See also *Department of Mental Hygiene* v. *McGilvery* (1958) 50 Cal.2d 742, 757-758 [18] [329 P.2d 689], wherein it is commented that "there appear to be natural and intrinsic reasons for classifying persons committed [to the Youth Authority] . . . differently from those who are mentally ill," including the fact that "The Authority performs functions which in many instances would have to be performed by our penal institutions. . . . Accordingly, there is good reason why government should not look to responsible relatives for the support and maintenance of youths committed to the Authority.")

In *People* v. *Brock* (1962), *supra*, 57 Cal.2d 644, 649 [5], we held that by the enactment in 1957 of section 6650.5 of the Welfare and Institutions Code the Legislature removed from the purview of section 6650 any commitment to a state hospital for the insane made pursuant to section 1026 of the Penal Code (defendant found not guilty under the M'Naughton tests of insanity and committed because that type of insanity continued at time of trial). The superior court there (acting under section 1026), after finding the accused to have been insane when the offense was committed, suspended criminal proceedings "until such time as the defendant is returned to this court for further proceedings" (p. 647 of 57 Cal.2d) and committed him to the Department of Mental Hygiene for placement in a state hospital. The accused was thereupon placed in Atascadero State Hospital, in conformance to the court's order that he "be restrained . . . as a person dangerous to be at large for the health and safety of others," with the further direction that " 'if ever, the defendant should be released from the State Hospital, he be returned to this court for further proceedings.' " (P. 647 of 57 Cal.2d.) Following attempts by the state to recover from the parents of the accused the costs of maintaining him at Atascadero this court in affirming judgment for defendants concluded (pp. 649-650 [5]) : "Thus commitment under such circumstances (arising from a charge of crime . . .) is placed on the same basis as the imprisonment of a defendant found guilty of crime, insofar as concerns

responsibility of relatives for his support in the state institution in which he is thereafter confined.''

Significantly, in *Brock* we further specified that (p. 650 of 57 Cal.2d) ''Our announced conclusion renders unnecessary a discussion of other contentions urged by the parties or of those advanced by amici curiae, who note that the statutes contain no provisions for giving the relatives notice or an opportunity to be heard in a criminal case sanity hearing, and attack on that ground *among others* the constitutionality of imposing upon the relatives liability for the care of a defendant committed to a state hospital following such a hearing.'' (Italics added.)

In the case at bench as above related the trial court found John ''legally insane at present'' and committed him to the state hospital (incidentally, Atascadero, the same as in *Brock*) ''for treatment, to remain there until certified by staff and Superintendent . . . that defendant is no longer insane . . . at which time defendant is to be returned to this court. Further proceedings [in the criminal action charging murder] suspended until such time.'' Thus here, equally as in *Brock,* the committed person is held in the state institution not merely because he is (or was) *insane* but because the state, in a proceeding instituted by it, has accused him of crime and *his detention is found to be necessary for the protection of the public.* The fact that here the accused has been found presently insane under the standard appropriate to Penal Code section 1368, does not provide a valid basis for sustaining a charge against a person not otherwise liable.

 From what has been said it is apparent that a person committed to a state institution under the provisions of section 1026 or of sections 1368 et seq. of the Penal Code is held for the primary purpose of protection of the public in the course of administration of laws prohibiting crime. Section 1371 declares that ''The commitment of the defendant . . . [to a state hospital for the care and treatment of the insane] exonerates his bail'' and section 1372 requires that ''When he becomes sane, the superintendent must certify that fact to the sheriff and district attorney'' and that ''The sheriff must thereupon . . . bring the defendant from the state hospital, and place him in proper custody until he is brought to trial or judgment . . . or is legally discharged.''

 The enactment and administration of laws providing for sequestration and treatment of persons in appropriate

state institutions—subject of course, to the constitutional guaranties—who would endanger themselves or others if at large is a proper state function; being so, it follows that the expense of providing, operating and maintaining such institutions should (subject to reasonable exceptions against the inmate or his estate) be borne by the state.

We deem it fundamental that only one who has been charged with or convicted of a crime may be made to suffer deprivation of his liberty, or be subjected to other penal sanction, for that crime. In the case at bench the person so charged and so committed is defendant's son—not defendant. ■ The Fourteenth Amendment, "in declaring that a State shall not 'deprive any person of life, liberty or property without due process of law,' gives to each of these an equal sanction; it recognizes 'liberty' and 'property' as co-existent human rights, and debars the States from any unwarranted interference with either." (*Coppage* v. *Kansas* (1915) 236 U.S. 1, 17 [35 S.Ct. 240, 59 L. Ed. 441, L.R.A. 1915C 960]; see also *City of New Orleans* v. *Miller* (1917) 142 La. 163 [76 So. 596, 598, L.R.A. 1918B 331].) ■ It has further been declared that "Life, liberty, property, and the equal protection of the law, grouped together in the Constitution, are so related that the deprivation of any one of those separate and independent rights may lessen or extinguish the value of the other three." (*Smith* v. *Texas* (1914) 233 U.S. 630 [34 S.Ct. 681, 682, 58 L.Ed. 1129, L.R.A. 1915D 677].)

■ The mere fact that innocent persons are relatives of an accused or convicted person does not deprive them of *their* fundamental rights or constitute a lawful basis for a statute or judgment whereby their property may be taken to pay the costs of prosecuting, detaining, or otherwise treating the accused. No decision or authority to the contrary has been cited or discovered. *Estate of Gestner* (1949) 90 Cal.App.2d 680 [204 P.2d 77], relied upon by plaintiff herein, involved liability of the estate of the accused himself, who had been committed under Penal Code section 1026, rather than liability of so-called "responsible relatives." *Gestner* therefore is not authority for or against the proposition here at issue and any statements or implications therein which are contrary to our holding today are disapproved. (See also *State* v. *Ikey's Estate* (1911) 84 Vt. 363 [79 A. 850, Ann.Cas. 1913A 575]; *In re Radoll's Guardianship* (1936) 222 Wis. 539 [269 N.W. 305]; *State* v. *Griffith*

(1941) 34 Ohio L.Abs. 95 [36 N.E.2d 489]; *Briskman* v. *Central State Hospital* (1954, Ky. App.) 264 S.W.2d 270; *In re Hockett's Estate* (1955) 177 Kan. 507 [280 P.2d 573]; *Green* v. *State* (1954, Tex. Civ. App.) 272 S.W.2d 133; in each of which the issue was liability of the estate of the accused, and not asserted liability of relatives.)

The judgment is reversed, with directions to the trial court to enter judgment in favor of defendant.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.