[Nos. B006572, B008233. Second Dist., Div. Six. Mar. 13, 1986.]

COUNTY OF SAN LUIS OBISPO et al., Plaintiffs and Appellants, v. THE ABALONE ALLIANCE et al., Defendants and Respondents.

## COUNSEL

Ronald A. Zumbrun, John H. Findley and Jonathan M. Coupal for Plaintiffs and Appellants.

Kathleen V. Fisher, Leigh R. Shields, Joanne Hoeper, Morrison & Foerster, Richard A. Rothschild and Leonard Post for Defendants and Respondents.

George William Pring and Fred H. Altshuler as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

WILLARD, J.*—The trial court sustained a general demurrer to the second amended complaint, without leave of appellants to amend, but with leave of other plaintiffs to amend. The order also "dismissed [appellants] from [the] action." Notice of appeal was filed from the order sustaining the demurrer and from the order of dismissal. The County of San Luis Obispo (hereinafter County) filed a separate appeal from an order that it pay attorneys' fees of $82,500 to the defendants' attorneys. ■ The order dismissing appellants from the case is deemed a judgment of dismissal of the action insofar as appellants are concerned and is appealable, as is the order made subsequent

---

*Assigned by the Chairperson of the Judicial Council.

to that judgment requiring payment of attorneys' fees. We affirm both judgments.

Three basic issues are presented for decision: (1) whether the second amended complaint states a cause of action on behalf of the County; (2) whether it states a cause of action on behalf of other appellants; and (3) whether the order for payment of attorneys' fees was proper.

A fourth issue was presented to the trial court and is argued in the briefs. It is whether the First Amendment right of political expression immunizes the alleged acts of defendants from civil liability. This appeal can be determined on the basis of the first three issues mentioned above. Therefore it is inappropriate to decide the constitutional question. (*Estate of Johnson* (1903) 139 Cal. 532, 534 [73 P. 424]; *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; *People* v. *Marsh* (1984) 36 Cal.3d 134, 144 [202 Cal.Rptr. 92, 679 P.2d 1033].) ■ As stated in *Williams,* "we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." (*People* v. *Williams, supra,* 16 Cal.3d at p. 667.)

## THE SECOND AMENDED COMPLAINT

### A. *The Parties.*

The appealing plaintiffs are the County; Countywide Coalition for Less Government, a California corporation said to be a coalition of groups and individuals, including taxpayers of the County and customers of Pacific Gas and Electric Co. (hereinafter PG&E); People for Energy Progress, a California nonprofit corporation that supports the development of "all forms" of safe, economical and environmentally sound energy resources; and Vicky Roland, an individual who is a paying customer of PG&E and a taxpayer of the County and of the State of California. PG&E is not a party to the litigation, and all parties alleged to be PG&E shareholders have withdrawn.

The defendants are Abalone Alliance, an unincorporated association; American Friends Service Committee, and Greenpeace, organizations the nature of which is unknown to plaintiffs; three named individuals; and 30 Does.

### B. *The First Cause of Action.*

The first cause of action makes allegations summarized in this section. During September 1981, a low-power operating license issued by the Nuclear Regulatory Commission was in effect for Diablo Canyon (a nuclear

power project under construction by PG&E, the purveyor of electricity within San Luis Obispo County). Power shortages will occur throughout California if Diablo is blocked from providing electric power. Alliance has circulated a publication stating its goal is to prevent the Diablo nuclear power plant from going into operation, pursuing legal channels, and non-violent direct action in the form of a blockade.

Defendants erected a tent city on private land for their members and others. More than 100 San Luis Obispo County sheriff's deputies were required to protect people in the area, including defendants.

On September 15, 1981, members of Alliance and others trespassed on someone's private property and blocked public roads. They forced their way onto "the grounds." Some workers were prevented from reaching their job sites at the plant, or their arrival was made more difficult. The workers were forced to stay overnight at the plant and sleep in unsuitable quarters such as national guard tents.

Members of Greenpeace supplied a boat and landing craft in which individuals approached the plant by ocean and entered the grounds.

Defendants intended this blockade to create additional costs to complete the plant, making completion infeasible or impossible. This was intentional interference with the contractual right of electric customer plaintiffs to receive service. Defendants' acts did require plaintiffs to incur expense. It also damaged property of PG&E, and caused PG&E expense that will be borne directly by its customers and shareholders.

The County plaintiff was damaged in an amount in excess of $700,000 for costs that would not have been incurred but for the illegal acts of defendants. Plaintiffs who are residents of San Luis Obispo County have been damaged as taxpayers and paying customers of PG&E. Plaintiffs who are paying customers and shareholders of PG&E have been damaged because the costs incurred by PG&E will be borne either by paying customers or by PG&E "so as to harm the interests of its shareholders." These PG&E costs are associated with damage to property, protection of property and employees, obtaining electricity from alternate sources, and increased construction costs.

C. *The Second Cause of Action.*

The second cause of action incorporates the first cause of action and in addition alleges that the actions of defendants are a private nuisance to plaintiffs.[1]

---

[1]This claim is not pursued in appellants' briefs.

D. *The Third Cause of Action.*

The third cause of action incorporates the first and in addition alleges that the acts of defendants interfered with the contractual rights of the PG&E customer plaintiffs against PG&E entitling such plaintiffs to electric service. It also alleges that defendants made the contractual relationships between the County and the County's own employees more burdensome.

E. *The Fourth Cause of Action.*

The fourth cause of action is stated to be in the alternative. It incorporates almost all of the first cause of action and in addition alleges that the actions of defendants constituted "prima facia [*sic*] . . . tort. *See* Civil Code § 3523."[2]

F. *Prayer.*

The relief requested in the second amended complaint is a money judgment against defendants jointly and severally for $2,981,000, plus interest, attorneys' fees, costs and an injunction. The request for injunction apparently was not pursued, has not been argued in the briefs, and appears to be moot.

DISCUSSION

A. *Claims of the County.*

The County seeks to recover its costs incurred in its exercise of police power during the blockade. The case most nearly in point is *City of Flagstaff* v. *Atchison, Topeka & Santa Fe* (9th Cir. 1983) 719 F.2d 322, 323. The city of Flagstaff had sued the defendant railroad in tort to recover the cost of police, fire and other emergency services necessitated by a chemical spill. It was held that, in the absence of a statute expressly authorizing recovery of public expenditures, "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service." (*Ibid.*)

Likewise, in *District of Columbia* v. *Air Florida, Inc.* (D.C. Cir. 1984) 750 F.2d 1077, the court held that the District of Columbia could not recover the expenses of extraordinary emergency services and cleanup resulting from the crash of an Air Florida plane into the Potomac river. The court

---

[2]Civil Code section 3523 states: "For every wrong there is a remedy."

held that, in the absence of statutory authorization, the District failed to state a claim for relief: "Where emergency services are provided by the government and the costs are spread by taxes, the tortfeasor does not anticipate a demand for reimbursement. Although settled expectations must sometimes be disregarded when new tort doctrines are needed to remedy an inequitable allocation of risks and costs, where a generally fair system for spreading the costs of accidents is already in effect—as it is here through assessing taxpayers the expense of emergency services—we do not find the argument for judicial adjustment of liabilities to be compelling." (*Id.*, at p. 1080.)[3] The court went on to explain its reluctance to create new tort doctrine: "We are especially reluctant to reallocate risks where a governmental entity is the injured party. It is critically important to recognize that the government's decision to provide tax-supported services is a legislative policy determination. It is not the place of the courts to modify such decisions. Furthermore, it is within the power of the government to protect itself from extraordinary emergency expenses by passing statutes or regulations that permit recovery from negligent parties. [Fn. omitted.]" (*Ibid.*)

■ In particular, a government entity may not, as the County seeks to do in this case, recover the costs of law enforcement absent authorizing legislation. " '. . . Under the general law, the expense of capture, detention, and prosecution of persons charged with crime is to be borne by the county. [Fn. omitted.] . . .' " (*Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247, 251 [28 Cal.Rptr. 718, 379 P.2d 22], quoting *Napa State Hospital* v. *Yuba County* (1903) 138 Cal. 378 [71 P. 450].) ■ As Professor Prosser has stated: "The state can never sue in tort in its political or governmental capacity, although as the owner of property it may resort to the same tort actions as any individual proprietor to recover for injuries to the property or to recover the property itself." (Prosser & Keeton, Torts (5th ed. 1984) § 2, p. 7.)

It follows that the only issues are whether (1) there is specific statutory authority permitting the County to recover for public expenditures; or (2) the County has alleged a tort that would entitle it to compensatory damages that are not based upon expenditures for the benefit of the public.

■ The County argues that there is express statutory authorization for it to recover its costs of abating the blockade as a public nuisance. There is, however, no such authorization found in the general public nuisance statutes under which the County purports to sue. (See Civ. Code, § 3479 et

---

[3]See also *People* v. *Wilson* (1966) 240 Cal.App.2d 574 [49 Cal.Rptr. 792] at page 576 ("No case has been cited, and we have found none, which permits, in the absence of a statute, the recovery of fire suppression expenses by one not protecting his own property.").

seq.) To the contrary, section 731 of the Code of Civil Procedure, the general provision permitting government entities to abate public nuisance, has been squarely held *not* to authorize the government to recover the costs of abatement. (*People* ex rel. *Gow* v. *Mitchell Brothers' Santa Ana Theater* (1981) 114 Cal.App.3d 923, 930 [171 Cal.Rptr. 85].)[4] It was there held that counties cannot obtain damages for abating a public nuisance because the statutory scheme does not authorize them to do so. The opinion explains: "This action was brought under the authority of Code of Civil Procedure section 731, which, inter alia, empowers a city attorney to bring a civil action 'to abate a public nuisance.' Abatement, however, is the sole relief that section 731 authorizes the city attorney to seek. This is evident when the above quoted language is compared to the first portion of the statute. That portion allows an action to be brought by 'any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance . . . .' Such a person is expressly authorized to seek a judgment where 'the nuisance may be enjoined or abated *as well as damages recovered therefor.*' (Italics added.) It is clear that the Legislature intended that one type of litigant could seek abatement *and* damages, while the other type of litigant could obtain abatement only. A city attorney, in an action 'brought in the name of the people,' fits squarely and exclusively in the latter classification." (*Ibid.*)

The California Supreme Court reaffirmed the *Mitchell Brothers* holding in *People* ex rel. *Van de Kamp* v. *American Art Enterprises, Inc.* (1983) 33 Cal.3d 328 [188 Cal.Rptr. 740, 656 P.2d 1170], stating, "although California's general nuisance statute expressly permits the recovery of damages in a public nuisance action brought by a specially injured party, it does not grant a damage remedy in actions brought on behalf of the People to abate a public nuisance." (P. 333, fn. 11.)

The County argues that it is not seeking damages under section 731, but instead is proceeding under general statutes such as Government Code section 23004 ("A county may . . . [s]ue and be sued."). Government Code section 27000 (obligating the County to "receive and keep safely" money) and Government Code section 53069.6 (requiring that County seek damages for negligent, wilful or unlawful damaging of public property). These gen-

---

[4]Plaintiff obtained review by the United States Supreme Court of a ruling that obscenity must be proved beyond a reasonable doubt under the United States Constitution. The United States Supreme Court held that it need be proved only by clear and convincing evidence, and reversed. (*Cooper* v. *Mitchell Brothers* (1981) 454 U.S. 90 [70 L.Ed.2d 262, 102 S.Ct. 172].) On remand, the Court of Appeal remanded to the trial court to afford the plaintiff the right to seek to enjoin six films which had not been proven beyond a reasonable doubt to be obscene. *In all other respects the earlier opinion of the Court of Appeal was reiterated.* (*People* ex rel. *Cooper* v. *Mitchell Brothers' Santa Ana Theater* (1982) 128 Cal.App.3d 937 [180 Cal.Rptr. 728].)

eral provisions do not prevail over the specific statutes governing abatement of a public nuisance. Nor by their terms do they authorize suits to recover costs incurred in exercising the police power. They provide no specific statutory authorization for the County to sue for public expenditures caused by the blockade.

The County also argues that specific statutory authorization for its claim is found in the provisions of Streets and Highways Code sections 1480 and 1480.5, which provide for the removal of an "encroachment" at the owner's expense. An "encroachment" is defined therein as a "structure or object." These words refer to inanimate objects, not human beings. We find no express statutory authorization for the County's suit to recover public expenditures for abatement of the public nuisance claimed to have existed in this case.

With regard to nuisance abatement, the County argues in its reply brief that the actions of appellants created a public nuisance as defined in Civil Code sections 3479 and 3480, authorizing the remedies specified in section 3491 ("1. Indictment or information; [¶] 2. A civil action; or, [¶] 3. Abatement."). The Civil Code goes on to provide that remedy by indictment or information is governed by the Penal Code (§ 3492); abatement by a public body or officer is authorized by law (§ 3494); and that "[a] private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise." (§ 3493.) These Civil Code sections establish substantive rights and duties, but the details of procedure are governed by other codes. Abatement, as previously indicated, is governed by section 731 of the Code of Civil Procedure; and, as discussed above, collection of damages by a public agency for abatement is not authorized.

The question remains as to whether the County has stated a claim in tort for compensatory damages in alleging interference with contract and "prima facia [sic] . . . tort."

■ The County's theory for its interference with contract claim is that the blockade interfered with employment relationships between the County and its deputy sheriffs and other personnel by requiring additional services.

The complaint, however, necessarily implies that the contracts with its personnel were fully performed. It alleges that more services were required and payment for them was an increased expense to the County. This is not the kind of "disruption of the relationship" required to state a claim. (See

*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 827 [122 Cal.Rptr. 745, 537 P.2d 865].)[5]

 Finally, the County, along with the non-County plaintiffs, is alleging the right to recover for a *"prima facia [sic] . . . tort . . ."* under Civil Code section 3523. (Italics added.) As discussed *infra,* no sufficient basis for general tort recovery has been alleged.

B. *Claims of the Non-County Plaintiffs.*

There are two political organizations and one individual plaintiff in addition to the County.[6] These non-County plaintiffs assert damage claims for public nuisance and "prima facia [sic] . . . tort."

In identical circumstances, the Minnesota Court of Appeals sustained a demurrer to a complaint seeking to recover the costs of law enforcement associated with civil disobedience in the offices of the Honeywell corporation. *(North Star Legal Foundation* v. *Honeywell Project* (Minn. 1984) 355 N.W.2d 186.) The North Star Legal Foundation had brought suit on behalf of taxpayers to recover damages for private and public nuisance and civil trespass. The court held that plaintiffs had failed to state a claim upon which relief may be granted, stating, "[l]iberal pleading rules . . . are not a substitute for substantive law." *(Id.,* at p. 188.)

1. *Real Parties in Interest.*

The non-County plaintiffs allege two general categories of harm. They allege that they will suffer increased taxes as a result of expenses for law enforcement and other public expenditures incurred by the plaintiff County and the State of California,[7] and they allege that they will experience increased utility rates because PG&E's costs will be passed on to them. These plaintiffs argue that they, or, in the case of the organizations, their members, will "ultimately pay the costs" of the blockade.

 Both the organizational and the individual plaintiffs are seeking to recover solely for damages actually incurred by others—the County, the

---

[5]Appellants cite dicta in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], to support their position. In *Seaman's,* the oil company defendant sought to deny the existence of a contract to supply oil, forcing plaintiff to attempt to purchase replacement oil at higher prices. No such denial of the existence of the County's employment contracts is alleged in the complaint under review.

[6]There were originally six political organizations and seven individuals (excluding plant workers) named as plaintiffs. All dismissed plaintiffs filed a notice of appeal. Four of the organizations and six individuals have dismissed their appeal, leaving two political organizations and one individual in the "non-County plaintiff" category.

[7]The PG&E shareholder plaintiffs are no longer parties to the appeal.

State of California, and PG&E. It is these third parties, not the non-County plaintiffs, who are the real parties in interest. The non-County plaintiffs are barred from suing by Code of Civil Procedure section 367, which (except for executors and trustees) limits the right to sue to the real party in interest.

 Taxpayers do not have the right to sue for public expenditures unless the public agency has: (1) a duty to sue; and (2) refused to so do. (*Silver* v. *Watson* (1972) 26 Cal.App.3d 905, 909 [103 Cal.Rptr. 576]; *Elliott* v. *Superior Court* (1960) 180 Cal.App.2d 894, 897 [5 Cal.Rptr. 116]; see generally *Dunn* v. *Long Beach L. & W. Co.* (1896) 114 Cal. 605, 609 [46 P. 607].) Here, the County has chosen to sue and plaintiffs have affirmatively alleged that the State has *not* refused to sue. More important, plaintiffs have not alleged a duty by the State or County to sue.

These non-County plaintiffs' claims of right to sue as ratepayers suffer from the same defect. Their claims are wholly derivative on behalf of PG&E. PG&E is entitled to sue for injuries to the utility. (See, e.g., Pub. Util. Code, §§ 7951-7953, ch. 4, "Injury to Public Utility Property.")

Plaintiffs rely on *Friendly Village Community Assn., Inc.* v. *Silva & Hill Constr. Co.* (1973) 31 Cal.App.3d 220, 225 [107 Cal.Rptr. 123, 69 A.L.R.3d 1142], for the proposition that taxpayers and ratepayers can sue because they "ultimately pay the costs . . . ." There it was held only that a homeowners' association did not have standing because the individual homeowners were the real parties in interest with respect to the alleged injuries to their real property. (*Ibid.*)

*2. Standing to Sue.*

 The two organizational plaintiffs allege no harm to themselves. Rather, they seek to recover damages supposedly suffered by their members and rely on a series of cases that suggest liberalizing standing principles in order to insure that issues involving the public interest are resolved.[8] The cases relied on by plaintiffs sought declaratory or injunctive relief which

---

[8]*Stocks* v. *City of Irvine* (1981) 114 Cal.App.3d 520, 533 [170 Cal.Rptr. 724] (low-income plaintiffs had standing to challenge exclusionary zoning practices); *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 128 [109 Cal.Rptr. 724] (neighborhood association had standing to challenge ordinance permitting development where members would be injured by permitting development to proceed); *Daniels* v. *Sanitarium Assn., Inc.* (1963) 59 Cal.2d 602, 607 [30 Cal.Rptr. 828, 381 P.2d 652] (unions have capacity to sue); *Central Valley Chap. 7th Step Foundation* v. *Younger* (1979) 95 Cal.App.3d 212 [157 Cal.Rptr. 117] (declaratory relief available to association of directly affected individuals). *California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16 [61 Cal.Rptr. 618], is also cited but is not in point. The association was refused relief on the apparent ground that it had no standing to sue. It did not appeal.

would inure to the benefit of the plaintiff organizations' members.[9] By contrast, the non-County plaintiffs here seek *damages* for harm supposedly suffered by their members, but allege no assignment of the damage claims of their members or even that their members would in fact benefit from any award to the organizations. The organizations, which allege no monetary injury to themselves, are therefore not entitled to recover.

Nor do the organizational plaintiffs satisfy the requirements for a representative or class action under Code of Civil Procedure section 382. Plaintiffs' reliance on *Residents of Beverly Glen, supra,* 34 Cal.App.3d 117, and other cases involving representative actions is therefore misplaced. ▄
As stated in *Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co.* (1981) 114 Cal.App.3d 783 at page 795 [171 Cal.Rptr. 334]: "The two requirements that must be satisfied for a *representative* action are an ascertainable class and a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented [citations]."
▄ Neither requirement is satisfied here. In fact, the complaint alleges that the membership of the plaintiff organizations, the "class" presumably being alleged, is made up of widely disparate organizations and individuals which "include," but are *not limited to,* either taxpayers or ratepayers. In short, the non-County plaintiffs do not have standing to bring the claims they have alleged.

### 3. *No Allegation of Special Damage.*

▄ An independent problem presented by the complaint of the non-County plaintiffs is that they have not pled, as required, that they were "specially damaged" in a different way than other members of the general public. Section 3493 of the Civil Code provides that "[a] private person may maintain an action for a public nuisance, *if it is specially injurious to himself, but not otherwise.*" (Italics added.) This requirement has been described as follows: "Where the nuisance alleged is not also a private nuisance as to a private individual he does not have a cause of action [for] public nuisance unless he alleges facts showing special injury to himself . . . or property of a character different *in kind* from that suffered by the general public." (*Venuto* v. *Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116, 124 [99 Cal.Rptr. 350].)

### 4. *General Tort Liability.*

▄ Plaintiffs attempt to assert a general cause of action for "tort" pursuant to Civil Code section 3523, which states, in its entirety: "For

---

[9]The only exception is *Daniels, supra,* which held that a union may sue for libel to recover damages for a wrong done to the organization itself.

every wrong there is a remedy." This section, however, does not create substantive rights. "[This] wholesome maxim of jurisprudence . . . can obviously have no application to any but legal wrongs or those wrongs for which the law authorizes or sanctions redress." (*Finch* v. *Western Nat. Bank* (1914) 24 Cal.App. 331, 338 [141 P. 261]; see also *Fortenbury* v. *Superior Court* (1940) 16 Cal.2d 405, 410 [106 P.2d 411] ("[T]he law does not invariably give relief against damage, because in some circumstances the infliction of damage, though intentional, is without legal remedy.").)

■ "[T]orts consist of the breach of duties fixed and imposed upon the parties by the law itself, . . ." (Prosser & Keeton, Torts, *supra*, § 1, p. 4.) Whether intentional or negligent, a tort "involves a violation of a *legal duty, imposed by statute, contract or otherwise, owed by the defendant to the person injured. Without such a duty, any injury is 'damnum absque injuria'*—injury without wrong." (4 Witkin, Summary of Cal. Law (8th ed. 1974) § 5, p. 2306, and cases cited therein.)

■ Appellants rely on Civil Code section 1708 ("Every person is bound . . . to abstain from injuring the person or property of another, or infringing upon any of his rights.") to aver that defendants, by their acts of civil disobedience, breached a universal duty to society at large and thus are liable in "tort." Yet the California courts have explicitly rejected the concept of universal duty. " 'It must not be forgotten that "duty" got into our law for the very purpose of combatting what was then feared to be a dangerous delusion . . . viz., that the law might countenance legal redress for all foreseeable harm.' " (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], quoting Fleming, An Introduction to the Law of Torts (1967) p. 47.)

Plaintiffs rely on two cases in support of their claim for "tort," *Laguna Publishing Co.* v. *Golden Rain Foundation* (1982) 131 Cal.App.3d 816 [182 Cal.Rptr. 813], and *Younan* v. *Equifax Inc.* (1980) 111 Cal.App.3d 498 [169 Cal.Rptr. 478]. In *Laguna Publishing*, the court held that a newspaper publisher had a direct right under the California Constitution to recover damages for deprivation of his rights of free speech and free press. The holding was explicitly limited to recovery for infringement of fundamental rights guaranteed by the California Constitution.[10] Plaintiff's purported right to unobstructed public roads and right to be free from unnecessary expenditures of public funds under existing contracts are not fundamental

---

[10]See also *Fenton* v. *Groveland Community Services Dist.* (1982) 135 Cal.App.3d 797 [185 Cal.Rptr. 758] (direct right to sue for damages resulting from interference with constitutional right to vote); *Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825 [134 Cal.Rptr. 839] (constitutional right of privacy).

rights guaranteed by either the California Constitution or United States Constitution.

*Younan* is equally inapposite. In that case, the court held that the plaintiff could recover from defendants who had conspired to prevent him from receiving benefits under an insurance contract. Its narrow holding, finding a cause of action for conspiracy to defraud, was grounded in established principles of fraud, conspiracy, and the fiduciary duties owned by an insurance company to its insureds. It has no relevance to this action.

Even if plaintiffs were real parties in interest and had established standing to sue, they have not alleged a cause of action in tort, and neither has the County.

C. *Attorneys' Fees.*

The trial court ordered appellants to pay respondents' attorneys $82,500 as fees pursuant to the private attorney general statute, Code of Civil Procedure section 1021.5.[11] Appellants contend that the award was improper because the litigation did not enforce important rights or confer benefits on persons other than defendants. They also argue that section 1021.5 permits fee awards to *defendants* only if the litigation is frivolous. Moreover, they assert that the amount requested by defendants was so outrageous that no fees should have been awarded.

1. *Important Right.*

Appellants contend that respondents did not enforce an *important* right. First, they assert that no "new concepts" were involved in the litigation. We need not determine whether this contention is correct because there is no such requirement. The Supreme Court in *Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311 [193 Cal.Rptr. 900, 667 P.2d 704], held that enforcement of established rights, as well as creation of new rights, can justify a fee award.

Plaintiffs also urge that because they disclaimed any intent to interfere with *lawful* protest, it follows that defendants' efforts were unnecessary to

---

[11]"Upon motion, a court may award attorney's fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

protect the lawful right to protest. Plaintiffs' intentions, however, are irrelevant. As the trial court concluded, the inevitable effect of the continuation of this lawsuit would be to chill large protests by substantially escalating the risks involved. A person or organization contemplating a mass protest in which civil disobedience is involved might accept the risk of conviction of a misdemeanor such as trespass. If this suit were successful, however, the risks of monetary loss, jointly and severally imposed on each defendant, could be enormous, and therefore unacceptable.

### 2. *Significant Benefit.*

The second requirement of section 1021.5 is that the litigation confer a significant benefit, whether pecuniary or nonpecuniary, on a large class of persons or the general public. Plaintiffs make two arguments on this criterion, one of them procedural and one substantive. ■■■ Their procedural argument is that the trial court should have made a specific finding that a large class of people was benefited. No finding on this matter was requested and none is required. (*Rees* v. *Department of Real Estate* (1977) 76 Cal.App.3d 286, 291 [142 Cal.Rptr. 789], and cases cited therein; Code Civ. Proc., § 634.) ■■■ A "judgment will not be set aside because of a failure to make an express finding upon [an] issue if a finding on it, consistent with the judgment, results by necessary implication from the express findings which are made." (*In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 462 [152 Cal.Rptr. 668], overruled on other grounds; *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 815 [166 Cal.Rptr. 853, 614 P.2d 285].) ■■■ In this case, the trial court's express finding that defendants' litigation helped to preserve the fundamental right of protest necessarily implies a finding that defendants conferred a benefit on the general public.

■■■ Plaintiffs also contend that since only defendants' economic interests were at stake, the litigation did not confer a significant benefit on a large class of persons. This does not mesh with the fact, discussed above, that defendants' success in the litigation confirmed important principles limiting the risks of political protest. In *Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428 [159 Cal.Rptr. 473], the court affirmed a fee award because of the trial court's finding that important environmental principles ("strong public policies") were involved even though the underlying litigation was settled in terms particularized to one single house and to the plaintiff's participation in further planning activities.[12]

---

[12]Plaintiffs' reliance on *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158 [188 Cal.Rptr. 104, 655 P.2d 306], is misplaced. In that case, the Supreme Court refused to award fees in litigation which "vindicated only the rights of the owners of

### 3. *Private Enforcement.*

██ The trial court did not abuse its discretion by ruling that both the necessity and financial burden of privately litigating this suit made a fee award appropriate. Since this suit was brought by a public entity (the County), the necessity of private rather than public enforcement is evident. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 941 [154 Cal.Rptr. 503, 593 P.2d 200].)

██ The "financial burden" criterion of section 1021.5 is met when "the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.'" (*County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 [144 Cal.Rptr. 71], quoted with approval in *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 941.) ██ Appellants, citing *Woodland Hills,* argue that the trial court's failure to make a specific finding on financial burden requires reversal. In *Woodland Hills,* however, the Supreme Court remanded the case because the trial court had made *no ruling at all* on the plaintiffs' entitlement to fees under section 1021.5, which was enacted while the case was on appeal. (*Woodland Hills, supra,* 23 Cal.3d at p. 925.) In this case, the trial court considered all the criteria imposed by section 1021.5 before concluding that defendants were entitled to fees. Plaintiffs' failure to request a specific finding on the "financial burden" criterion waives any objection to the lack of a finding. (*Rees* v. *Department of Real Estate, supra,* 76 Cal.App.3d at p. 291.)

██ As stated in one of the exhibits submitted by plaintiffs to the trial court, "PLF's purpose in bringing the suit was threefold: (1) to insure that illegal means did not prevent the proper regulatory process of testing and review; (2) to prevent taxpayers and consumers from having to subsidize the group's [defendant Abalone Alliance] illegal actions; and (3) to protect the public interest, including the right of an employee to report for lawful work."

Similarly, the motivation for defending this lawsuit cannot reasonably be attributed exclusively to a desire by defendants to protect their own pocketbooks. This is not a garden variety damage suit. Just a few weeks after filing suit, plaintiffs moved for a preliminary injunction to prevent defendant Abalone Alliance from planning or conducting any future blockades of Dia-

---

a single parcel of property." (*Id.,* at p. 167.) As the high court stressed, however, the victory won by the plaintiffs in that case would have little or no effect on the rights of other property owners. In this case, by contrast, the benefits of defendants' victory will be shared by any person contemplating political protest by picketing.

blo Canyon. If respondents had been interested solely in avoiding pecuniary loss, they could readily have agreed to an injunction. Instead, by vigorously resisting appellants' motion, they indicated that their goals were not merely financial.

The file shows that defendants are antinuclear and environmental activists concerned with a political goal—"the termination of the Diablo Canyon facility as a nuclear power plant." Since defendants' goal in litigating this suit transcends their personal self-interests, the "financial burden" criterion is met.

### 4. *Awarding Attorneys' Fees to Defendants.*

■ Plaintiffs also suggest that defendants should be denied fees because they were defendants rather than plaintiffs in the court below. Section 1021.5, however, provides for a fee award to a "successful party" and draws no distinctions between plaintiffs and defendants. In the only California case on point, fees were awarded to a successful defendant. (*Wallace v. Consumers Cooperative of Berkeley, Inc.* (1985) 170 Cal.App.3d 836 [216 Cal.Rptr. 649].) While the defendant was also a cross-complainant, fees were awarded for all time spent on the case, including time spent on defending plaintiff's separate action for civil penalties, not just for litigating the cross-complaint. The award of fees was upheld as a reasonable exercise of discretion.

Allowing section 1021.5 fees only to complainants would not be consistent with the express wording or purposes of the statute.

### 5. *Amount of Award.*

■ Plaintiffs also contend that the fee award was excessive.

Defendants submitted to the trial court comprehensive records, which itemized and explained time devoted to the case by attorneys and paralegals for whom fees were claimed. They multiplied the hours spent by each attorney and paralegal by a reasonable hourly rate. The resulting "lodestar" figure was $146,846.25, which defendants requested should be augmented by a "multiplier" of 50 percent (see *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303]), resulting in a total fee claim for $220,269.37. The trial court, after reviewing the record, awarded $82,500 in attorneys' fees—$75,000 for work on the merits of the case, plus $7,500 for time spent establishing entitlement to fees. (See *Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 [186 Cal.Rptr. 754, 652 P.2d 985].) The court reasoned that defendants had not yet been completely successful because some plain-

tiffs (the plant workers) remained in the suit even though it had been dismissed insofar as appellants were concerned. Therefore, the trial court concluded, defendants should recover only for the time reasonably spent *against the County,* which the court determined was valued at $75,000. The reduction was made without prejudice to the right of defendants to move for fees against the undismissed plant worker plaintiffs if defendants subsequently are successful against them. The court did not use a multiplier.

This case was both complex and vigorously litigated. It was ultimately resolved by demurrer, but not before extensive litigation on a variety of issues, ranging from motions to strike, to a request for preliminary injunction, to extensive discovery litigation. In all, there were approximately 113 pleadings filed by the time the fee motion was decided.

The " 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*Serrano* v. *Priest, supra,* 20 Cal.3d at p. 49.) Here, the trial judge reviewed the record and exercised his discretion reasonably. We find that he did not abuse it.

## CONCLUSION

The judgment dismissing the second amended complaint insofar as appellants are concerned is affirmed. Likewise, the judgment ordering appellant County of San Luis Obispo to pay respondents' attorneys' fees of $82,500 is affirmed.

Stone, P. J., and Abbe, J., concurred.

A petition for a rehearing was denied April 9, 1986, and appellants' petition for review by the Supreme Court was denied June 24, 1986. Mosk, J., Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.